[Cite as *State v. Leegrand*, 2020-Ohio-3179.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,              :

                                              No. 108626

v.                                                    :

TYRONE LEEGRAND, II,                    :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, REVERSED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:**  June 4, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-623531-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Katherine E. Mullin and Brad Meyer,
Assistant Prosecuting Attorneys, *for appellee.*

Thomas Rein, *for appellant.*

MARY J. BOYLE, P.J.:

{¶ 1}  Defendant-appellant Tyrone Leegrand, II, appeals his convictions.

He raises five assignments of error for our review:

1. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29[A], on the charges, and thereafter entering a judgment of conviction of that offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

2. Appellant's convictions are against the manifest weight of the evidence.

3. The trial court erred in the admission of hearsay evidence and testimonial statements, in violation of Appellant's right to confront his accusers, as protected by the Sixth Amendment of the United States Constitution.

4. The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

5. The trial court erred by ordering Appellant to serve an improper sentence.

{¶ 2} Finding merit to his final assignment of error, we affirm Leegrand's convictions but vacate his sentence and remand to the trial court for resentencing.

## I. Procedural History and Factual Background

{¶ 3} The charges in the case arose from events that took place on June 10, 2013. At 11:13 p.m. that night, Nunzio's Pizza on Lorain Avenue received a call for a pizza order to be delivered to 5822 Bridge Avenue. In the early morning of June 11, 2015, Nunzio's driver, Michael Prock, drove to 5822 Bridge Avenue with the pizza order in his green Buick. Witnesses saw Prock get out of his car, speak with someone, get back in his car, and, with the pizza order still in his vehicle, start to drive away. He turned onto West 59th Street and drove toward Ellen Avenue. As he drove down West 59th Street, someone shot at his vehicle from behind. One

witness who knew Leegrand testified that she saw him shoot at Prock's vehicle. She described his gun as "black and clunky * * * like a Hi-Point." One of the bullets struck Prock. Prock turned left onto Ellen Avenue, crashed into a parked silver Pontiac, and came to a stop near the sidewalk in front of a home located at 6110 Ellen Avenue. Prock passed away within seconds or minutes after he was shot. The shooter fled. Police found a broken cell phone and four spent shell casings near 5822 Bridge Avenue. The cell phone had been stolen on June 6, 2015, and someone used it to order the pizza from Nunzio's on June 10. The spent shell casings were later connected to a Hi-Point 9 mm semiautomatic pistol found in the oven of an Akron townhome that Leegrand had visited in June 2015. Leegrand's girlfriend and friend both testified that Leegrand told them that he was responsible for the pizza delivery homicide.

{¶ 4} In December 2017, over two years after Prock's death, Leegrand was indicted on ten counts as follows:

Count 1: Aggravated murder in violation of R.C. 2903.01(A), an unclassified felony, with one- and three-year firearm specifications;

Count 2: Aggravated murder in violation of R.C. 2903.01(B), an unclassified felony, with one- and three-year firearm specifications;

Count 3: Murder in violation of R.C. 2903.02(B), an unclassified felony, with one- and three-year firearm specifications;

Count 4: Felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony, with one- and three-year firearm specifications;

Count 5: Felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony, with one- and three-year firearm specifications;

Count 6: Aggravated robbery in violation in R.C. 2911.01(A)(1), a first-degree felony, with one- and three-year firearm specifications;

Count 7: Aggravated robbery in violation in R.C. 2911.01(A)(3), a first-degree felony, with one- and three-year firearm specifications;

Count 8: Carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a fourth-degree felony;

Count 9: Tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony; and

Count 10: Having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony.

{¶ 5} In January 2018, Leegrand pleaded not guilty to all ten counts. In March 2019, Leegrand waived his right to a jury trial as to Count 10, having weapons while under a disability, which was tried to the bench. On March 4, 2019, an eight-day jury trial ensued on the remaining nine counts.

**A. The State's Evidence Presented at Trial**

**1. The Crime Scenes on Bridge and Ellen Avenues**

{¶ 6} Tanika Givhan testified that on June 11, 2015, she parked her red Chrysler on Ellen Avenue and walked with her friend Trell to Bridge Avenue to wait for her girlfriend to arrive home. Givhan testified that while on Bridge Avenue, she saw and spoke with Leegrand and her friend Chris. Givhan said that she had known Leegrand for "a few years" as "T.Y." She said that Leegrand was wearing dark clothing.

{¶ 7}   Givhan testified that she saw a vehicle pull up to the corner of Bridge Avenue and West 59th Street, which she described as an ally, and Leegrand crossed Bridge Avenue to meet the driver.  She said that the driver exited the car, Leegrand and the driver talked, and the driver got back in his car, turned onto West 59th Street, and started to drive toward Ellen Avenue.  She then saw Leegrand shoot "at the car" once, wait about three seconds, and then fire seven to eight more shots.  She stated that Leegrand then "disappeared."  She testified that she saw Leegrand's gun as he was firing it and described it as "black and chunky * * * like a Hi-Point."

{¶ 8}   Givhan testified that she and Chris approached the wrecked Buick on Ellen Avenue. [1]  She did not know where Trell went.  She stated that the driver was bloody and looked like he was dying.  She testified that some of the neighbors came outside, and a younger white male called 911.  Givhan testified that after she saw the driver, she and Chris got in her red Chrysler and left the scene.

{¶ 9}   Givhan testified in prison clothes because she was serving a five-year prison term for an aggravated robbery conviction in Lake County.  She had dreads at trial and identified a photo of herself with dreads from June 2015.  On cross-examination, Givhan admitted that the state told her that if she testified in this case, it would recommend to the Lake County judge in her aggravated robbery case that she be released from prison before the end of her five-year sentence.  She also

---

[1] West 59th Street dead ends at Ellen Avenue on one end and at Bridge Avenue on the other end.  Where West 59th Street dead ends on Ellen Avenue, vehicle traffic must turn left because Ellen Avenue is a one-way street in that direction.  Thus, Prock turned left onto Ellen Avenue before crashing into a parked car.

admitted that she had not spoken to police or anyone from the prosecutor's office about what she witnessed on June 11, 2015, until after she was arrested for aggravated robbery in September 2016. On redirect examination, Givhan testified that she was previously unwilling to testify because she feared for her safety and her family's safety if she testified against Leegrand.

{¶ 10} Scott Carney, who lived on Ellen Avenue, testified that in the early morning of June 11, 2015, he was on his porch when he heard three to four "booms," squealing tires, and a loud crash all within approximately ten seconds. He testified that from his driveway he saw an African-American male with "poofy hair," a short goatee, and a greenish-black hooded sweatshirt with the hood halfway up, just covering his ears. He stated that the male was walking on the sidewalk on West 59th Street toward Ellen Avenue. Carney said that when the man got to Ellen Avenue, he turned right and walked down Ellen Avenue toward West 58th Street, which was the opposite direction from where the vehicle had crashed. Carney testified that the man did not look like he had any physical disabilities and was not using crutches. Carney stated that West 59th Street is well lit, but Ellen Avenue is darker with not many streetlights.

{¶ 11} Carney "turned [his] focus on the accident site" and "went into help mode." As Carney was walking toward the accident, he saw two African-American males standing in the middle of Ellen Avenue near a red car that was parked on the street. He stated that one of them had dreads and other one had shorter hair.

Although he believed that they were both males, he identified a photo of the one with dreads, who the state later established was Givhan.

{¶ 12} Carney could tell that the two people were "in shock and disbelief" because the one with dreads had "a shakiness" to her voice. Carney said the one with dreads pulled out a cell phone, and Carney grabbed it to call 911 as they all approached the wrecked Buick. Carney noticed as he approached the Buick that it had what appeared to be a bullet hole on the back panel of the car. He then realized that a shooting had occurred. Carney handed the phone back to the person with dreads so that he could help the victim.

{¶ 13} Carney said that when he reached the Buick, it was still idling, and the driver was struggling to breathe. Carney reached inside the open driver's side window and turned off the car. Carney explained that the person with dreads was "freaking out" and could not talk to the 911 operator, so Carney took the phone back and reported the location. Carney tried not to touch anything but said that he held the driver's head in his hands and "said a prayer over him."

{¶ 14} Carney testified that after he ended the 911 call, the person with dreads said "that she couldn't be there." She grabbed her phone back, snapped a picture of the victim, got in the red car with her friend, who had gone to get the car, and drove away.

{¶ 15} Brandon Isner, another Ellen Avenue resident, testified that in the early morning of June 11, 2015, he heard three to six "cracks" that he suspected to be gunshots very close to his house. He came outside and saw Carney and Carney's

girlfriend running toward a car that looked like it was parked on Ellen Avenue, which he described as "a very narrow, very small street." Isner said that he followed Carney, that Carney told him someone had been shot, and that Carney was "basically leaning in the [Buick]" trying to hold the victim's head up. Isner testified that "there was blood all over the car." Isner said that Carney's girlfriend called 911, but the driver appeared to have passed away about a minute before emergency medical personnel arrived. Isner testified that before the police and ambulance arrived, an African-American male and female in their fifties were walking down Ellen Avenue. He said they approached the Buick briefly, but they did not stop.

{¶ 16} Officer Tony Gonzalez testified that in the early morning of June 11, 2015, he and his partner received a radio broadcast "for shots fired" near West 58th Street and Bridge Avenue. He stated that they drove to that area to patrol, and approximately ten minutes later, they received a radio broadcast for an accident at 6110 Ellen Avenue. He testified that they drove to Ellen Avenue and saw that a green Buick had hit a parked silver Pontiac. Officer Gonzalez testified that the Buick's driver "looked deceased," and there were "holes in his car." Officer Gonzalez testified that as he approached the vehicle, he recognized the deceased man as "a pizza delivery guy" from Nunzio's.

{¶ 17} After securing the scene on Ellen Avenue, Officer Gonzalez and his partner went to Nunzio's, learned that the Buick driver was Michael Prock, and obtained Prock's delivery route. Officer Gonzalez stated that the first address on

Prock's delivery route was 5822 Bridge Avenue, so they drove to that address.[2] Officer Gonzalez testified that he and his partner found broken glass and four spent shell casings on the ground near 5822 Bridge Avenue, as well as part of a broken flip phone on the front lawn of a house across the street from where they found the spent shell casings. Officer Gonzalez testified that Bridge Avenue was "pretty dark," even with the operating streetlights.

{¶ 18} The officers spoke with Kelley Qolak, who lived near 5822 Bridge Avenue and called 911 to report the gunshots on Bridge Avenue. Officer Gonzalez's body camera recorded Qolak telling the officers that after hearing the shots, she looked out of her window and noticed three males on both sides of Bridge Avenue "hiding by trees and just like hiding in the shadows [.]" She described the males as African-American and approximately 16 or 17 years old. She said that after the shots were fired, the males ran down Bridge Avenue, and that one of the males was wearing an orange hooded sweatshirt.

### 2. The Forensic Examinations

{¶ 19} Detective Gregory Cook, a homicide investigator with the Cleveland Police Department, testified that he sent Prock's vehicle to be processed for fingerprints. Police found only Carney's fingerprints on the door handle. Detective Cook also requested that the Medical Examiner's Office test the shell casings and the flip phone pieces for DNA. Detective Cook testified that he took Leegrand's buccal swabs, and Leegrand's DNA did not match any of the crime-scene evidence.

---

[2] 5822 Bridge Avenue is on the corner of West 59th Street and Bridge Avenue.

{¶ 20} Dr. Dan Galita, a forensic pathologist who performed an autopsy on Prock on June 11, 2015, testified that Prock's death was a homicide caused by a gunshot wound. Dr. Galita estimated that Prock passed away within seconds to minutes after he was shot. He testified that Prock was shot one time in the right back from more than three feet away, likely from behind and from the right side of the vehicle. Dr. Galita explained that the bullet was still in Prock's body at the time of the autopsy, and that he recovered it and submitted it to the firearms department of the Medical Examiner's Office. Dr. Galita reviewed Prock's toxicology report as part of the autopsy, and that the toxicology report showed "recent cocaine use, probably a few hours before his death."

{¶ 21} Curtiss Jones, a supervisor of the Trace Evidence Unit of the Cuyahoga County Medical Examiner's Office, testified that he examined Prock, his clothing, and the vehicle in which he was brought to the Medical Examiner's Office. Jones's trace evidence report was admitted into evidence. He explained that Prock's shirt contained no gunpowder, grease, or nitrates, signifying that Prock was shot from a distance. Jones testified that Prock's vehicle contained no drugs, firearms, or contraband. He stated that the driver's side seat contained a bullet hole, the front windshield was struck by a bullet from the inside of the car, and the rear windshield and the rear driver's side window were broken due to bullet damage. Jones testified that he accounted for three bullets that entered Prock's vehicle, but that there may have been more. When defense counsel asked Jones on cross-examination if a shot

"could have been fired from someone that was talking to the driver through the driver's window," Jones responded, "it couldn't have been fired that way."

### 3. The Cell Phone Found on Bridge Avenue

{¶ 22} Nicole Serpone, who managed Nunzio's pizza in June 2015, testified that at 11:13 p.m. on June 10, 2015, a man ordered pizza to be delivered to 5822 Bridge Avenue. She stated that Nunzio's had delivered to 5822 Bridge Avenue several times before, but the phone number used that night, 216-***-8697 (the "-8697 number"), did not match the phone number previously used to place orders to that address.

{¶ 23} Luis Sepulveda testified that he had a cell phone with the -8697 number, but that the phone was stolen from his girlfriend, Evelyn Santiago. Santiago testified that around midnight on June 6, 2015, she was walking on the corner of West 65th Street and Colgate Court when someone approached her from behind and stole her purse, which contained her bank cards, her cell phone, and Sepulveda's cell phone. She testified that she did not see her assailant, and at trial, she did not recognize Leegrand. The state showed Santiago and Sepulveda two pieces of the flip phone found near 5822 Bridge Avenue on June 11, 2015, and they both identified the phone as Sepulveda's with the -8697 number.

{¶ 24} Mark Wilson, who in June 2015 was a staff operations specialist for the Federal Bureau of Investigations, worked with the Cleveland Police Department on this case. He testified that Detective Cook gave him the call-detail records for the -8697 number. Wilson searched law enforcement and open source databases,

targeting the dates June 10 and 11, 2015, to identify people who called or received calls from the -8697 number. Wilson stated that around the same time as the Nunzio's pizza calls, he noticed three calls with a number ending in -3172, which was associated with a Facebook name, "Mocha S. Monae." He compiled the information he found into an Excel spreadsheet, which was admitted into evidence.

{¶ 25} Asia Thomas testified that in June 2015, she used the name "Mocha Monae" for her Facebook account, and her phone number ended in -3172. She went to high school with Leegrand, and he was her brother's friend. She stated that she and Leegrand were not friends in school, but she would see him "around the neighborhood." She said that in 2015, she talked to Leegrand "here and there." She stated that Leegrand had her phone number, and they were Facebook friends. The state showed Sepulveda's phone records and Wilson's spreadsheet to Thomas. She testified that she did not know Sepulveda, and she had no memory of the calls on June 11, 2015.

### 4. Leegrand's Statements to Friends and Family

{¶ 26} Rochell Ford, Leegrand's aunt, testified that Leegrand stayed at her house "every other day * * * when he had nowhere else to go." She had met Leegrand's girlfriend, Audriana Watson. She testified that sometime before June 16, 2015, Leegrand and Watson were in Cleveland staying at her house, and she dropped them off at a bus stop downtown so they could take a bus to Akron. She stated that sometime later in June 2015, Watson called her. She described Watson

as drunk and "a wreck" on the phone. She testified that after she talked to Watson, she called Leegrand's mother and told her that "her son killed the pizza man."

{¶ 27} Defense counsel objected to Ford's statement and moved for a mistrial, arguing that Ford's testimony that she told Leegrand's mother that her "son killed the pizza man" was improper hearsay testimony. The state responded that the testimony was not hearsay because Ford, who was on the stand, was the declarant. The state further argued that the foundation for Ford's statement was her phone call with Watson, and that Watson would testify next. After a brief recess, the trial court sustained defense counsel's objection, denied the motion for a mistrial, and instructed the jury to disregard Ford's statement that she told Leegrand's mother that "her son killed the pizza man."

{¶ 28} Ford further testified that Leegrand called her from the Summit County jail on June 16, 2015, and she confronted him about what Watson had told her.[3] Ford testified, and the recording played to the jury shows, that on the call Leegrand confirmed that he did tell Watson "exactly what was said." Ford stated that she did not believe Leegrand when he told her, "I ain't never say I did sh*t," and, "I know somebody who seen what — [.]"

{¶ 29} Ford further testified that she told Detective Bob Beveridge what she had learned from Watson about the shooting. As a result of Ford's information, Crime Stoppers rewarded Ford with $1,500. Ford testified that she did not want the

---

[3] Leegrand submitted a booking report from the Summit County Sheriff's Office into evidence, which stated that Leegrand arrived at the Summit County Jail on June 15, 2016, for unrelated charges.

money, but she did accept it. Detective Beveridge testified that he received a call from Ford, whom he had known for years from his involvement in the neighborhood, and he went to her house to talk to her and her daughter. Detective Beveridge testified that he was told that someone by the name of "Rio" wanted to talk to him. Detective Beveridge and Ford called Rio, with Detective Beveridge's body camera recording the conversation. Detective Beveridge testified that he then began to investigate Rio, Rio's girlfriend, and Leegrand. Detective Beverage stated that he sent the information to the Homicide Unit.

{¶ 30} Audriana Watson testified that she dated Leegrand for approximately six months in 2015, but she knew him by the names of "Adrian Benson" and "Drizzy." She testified that in 2015, Leegrand had "a top fro, curly fro" and "a full connect, a beard and a mustache." Watson stated that Leegrand did not have any crutches or a walking boot with him at the time, and he did not appear to be physically disabled.

{¶ 31} Watson testified that in early June 2015, Leegrand called and told her to read an online article about a pizza delivery man who had been shot. Watson testified that Leegrand did not tell her anything about the article other than to read it. Watson said that she read the article and called Ford. Watson denied being drunk on this call but described herself as "hysterical," "scared," and "worried." Watson testified that she told Ford that Leegrand told her to read the article and that Watson thought Leegrand "was the one that did it."

{¶ 32} Watson stated that sometime thereafter, Leegrand came to her mother's house in Akron, where Watson was living at the time. She thought that the visit took place before June 16, but she was not certain. Watson testified that Leegrand told her that he had done "something bad, and he was apologizing." She testified that Leegrand told her that "basically this guy tried to rob him and tried to pull off, and then he shot him." Leegrand further told her that "[b]asically, it was a drug deal gone bad." Watson explained that Leegrand stated he "walked up to the car to deliver some drugs, the guy snatched the bag and tried to pull off, and when he tried to pull off, that's when he shot him." When the prosecutor asked Watson how she knew that Leegrand was talking about the pizza delivery guy, Watson replied, "Because for probably a week or so that's the only situation that I had talked to him about." Watson stated that Leegrand had a black gun on him when she was talking to him on the porch and told her that he was going to kill himself. Watson testified that she recognized the Hi-Point gun that the state presented to her at trial. She stated that it looked like the gun that Leegrand had with him when they spoke at her mother's house.

{¶ 33} The state played four recorded phone calls from the Summit County jail between Leegrand and Watson that took place on June 16, 2015. Watson testified that Leegrand was upset with her for calling Ford and directed her not to answer calls from phone numbers that she did not recognize. The call recordings reflect that Leegrand yelled at Watson, "What the f*ck is wrong with you? * * * Do

you understand what the f*ck you just did? * * * You just f*cked up my whole life." Leegrand directed her to not talk to anyone else, and to change her phone number.

{¶ 34} Watson testified that she had no further conversations with Leegrand about the pizza delivery homicide. He tried calling her, but she would not answer. Watson stated that about two weeks after the porch conversation, she received threatening calls from random numbers "telling [her] not to say anything and that they knew where [she] lived."

{¶ 35} China Kelley, who appeared at trial in jail clothes for failing to appear to testify in this case, testified that she knew Leegrand as "Drizzy" and met him through friends in Akron in 2015 or 2016. Kelley stated that the last time she saw Leegrand, he used her phone to show her a video on YouTube of a news story reporting the death of a pizza delivery man. Kelley testified that Leegrand told her, "You know I did that." Kelley stated that she did not believe Leegrand because "he's a character. He is very dingy. You never know what you [are] going to get out of him." She stated that at the time, Leegrand had "a curly fro" and was not using crutches to walk.

### 5. The Gun Used to Shoot Prock

{¶ 36} Ashley Pawlak, who manages an apartment complex in Akron, testified that one of her tenants, Amanda Freeman, moved out of her townhome on June 29, 2015. Pawlak testified that she inspected the townhome with a maintenance employee and found a black gun inside the oven. Pawlak called the police. An officer from the Akron Police Department testified that on June 30, 2015,

he went to the townhome to pick up the gun, which was a black a Hi-Point 9 mm semiautomatic pistol. A firearms examiner at the Cuyahoga County Regional Forensic Laboratory conducted a forensic analysis on the Hi-Point and the four spent shell casings that were found at 5822 Bridge Avenue on the night of Prock's death. The firearms examiner found that all four spent shell casings were fired from the Hi-Point gun. The examiner also determined that the pellet and fragments recovered from Prock's body had "no analytical value."

{¶ 37} Amanda Freeman testified that she rented a townhome in Akron from March 2014 through the end of June 2015. She stated that she resided in the townhome by herself but often had friends over. Freeman testified that before she moved out, she had frequently been traveling between Akron and Minnesota, and she was not physically living in the townhome after May or early June 2015. She testified that her best friend, Rio, had brought over somebody named "Drizzy" toward the end of the time that she was living in the townhome, and they all smoked marijuana together. Freeman stated that she used her oven often, does not like guns, had no contact with guns while staying in the townhome, and did not put a gun in her oven. She testified that she did not know there was a gun in her oven when she moved out of the townhome, and she did not know how it got there. Freeman stated that the deadbolt on her back door was loose, and somebody could have entered her townhome through the back door. She testified that Rio was the only person who knew that she was leaving the townhome at the end of June.

{¶ 38} Demario Carpenter, who also went by "Rio," testified that Leegrand periodically lived with him in Akron "on and off" for "two or three months at a time," and that Leegrand was living with him in June of 2015. Carpenter knew Leegrand as "Drizzy." Carpenter stated he had gone to Freeman's townhome with Leegrand once or twice. He testified that in sometime in June 2015, Leegrand called him and asked for a ride from a bus stop in Akron. Leegrand had just arrived in Akron on a bus from Cleveland. Carpenter stated that when he picked up Leegrand, Leegrand kept repeating, "I'm a savage."

{¶ 39} On June 16 and 17, 2015, Leegrand called Carpenter from the Summit County Jail. On the recorded calls, which were played to the jury, Carpenter told Leegrand that he was upset because Carpenter had received "a million" calls from detectives and Leegrand's girlfriend and aunt asking Carpenter about the death of the Nunzio's pizza delivery man. In response, Leegrand told Carpenter to block all numbers with the Cleveland area code 216.

{¶ 40} At the end of the state's case, Leegrand moved for a Crim.R. 29(A) acquittal. The trial court denied the Crim.R. 29(A) motion without explanation.

## B. Leegrand's Evidence Presented at Trial

{¶ 41} Leegrand called two witnesses on his behalf: Cortilya Hearst and Kelley Qolak. Hearst, Leegrand's cousin, testified that in June 2015, she, her adult children, and Leegrand were living together in Twinsburg. She stated that Leegrand lived with her for at least two years and spent every night in her residence. She testified that Leegrand is the same age as her son, and the two had a curfew of

midnight.  She stated that she did not allow her son or Leegrand to bring women into the home, and she never met any of Leegrand's girlfriends.

{¶ 42} Hearst testified that sometime in June 2015 (she did not remember exactly when), Leegrand broke his leg and fractured his foot while he and her son "were doing things that boys always are not supposed to do," such as "climbing trees." His injury required him to wear a "boot cast" for six months and use crutches to walk.  She stated that she did not know precisely how Leegrand injured his leg and foot, and she did not remember exactly which hospital he visited.  She described Leegrand in 2015 as having "a little" facial hair and "short and curly" hair.

{¶ 43} Qolak testified that in 2015, she lived at 5811 Bridge Avenue, on the second floor with an unobstructed, well-lit view of Bridge Avenue below.  She testified that shortly after midnight on June 11, 2015, she was in bed when she heard five to eight gunshots.  She stated that she immediately looked out the window and saw the taillights of "a car speeding away down" West 59th Street, which she described as an alley, toward Ellen Avenue.  She further testified that she saw three African-American teenagers, who she thought to be 16 or 17 years old.  She stated that one was standing on a tree lawn, a second in a driveway, and a third on the sidewalk, who "turned around and was shooting as he was starting to run."  She explained that they met up on the sidewalk, ran down Bridge Avenue, and turned onto West 58th Street.

{¶ 44} Qolak testified that the shooter was using a pistol.  She stated that one of the teenagers was wearing a florescent orange hooded sweatshirt with the hood

up, but she does not remember which one. At trial she stated that she did not recognize Leegrand and did not remember seeing him on June 11, 2015. Qolak testified that she called 911 after hearing the gunshots, and police arrived approximately ten minutes later. The police interviewed Qolak in her home and observed the view from her bedroom windows.

{¶ 45} The parties stipulated to the admission of a booking report from the Summit County Sheriff's Office. The report states that Leegrand arrived at the Summit County Jail on June 15, 2015, for unrelated charges. The report identifies Leegrand's belongings, which included only one shoe. The report also includes a note from July 2, 2015, which states, "Inmate no longer wears his walking boot. Inmate wears his jail sandals around the pod."

{¶ 46} Leegrand renewed his Crim.R. 29 motion at the close of his case-in-chief, and the trial court again denied the motion without explanation.

### C. The Jury's Verdict

{¶ 47} After deliberations, the jury found Leegrand not guilty of Counts 1 and 2, aggravated murder, and Counts 6 and 7, aggravated robbery. The jury found Leegrand guilty of Count 3, murder, with the one- and three-year firearm specifications; Count 4, felonious assault, with the one- and three-year firearm specifications; Count 5, felonious assault, with the one- and three-year firearm specifications; Count 8, carrying a concealed weapon; and Count 9, tampering with evidence. The trial court found Leegrand guilty of Count 10, having weapons while

under a disability.  The trial court referred Leegrand to the Probation Department for a presentence investigation report.

### D. Sentencing

{¶ 48} The trial court ordered that Counts 4 and 5, felonious assault, merge into Count 3, murder.  The firearm specifications associated with Counts 4 and 5 likewise merged into the three-year firearm specification associated with Count 3. The trial court sentenced Leegrand as follows: for Count 3, murder, life in prison with parole eligibility after 15 years, as well as three years for the accompanying gun specification, to be served prior and consecutive to Count 3; for Count 8, carrying a concealed weapon, 18 months, to be served concurrently with Count 3; for Count 9, tampering with evidence, 36 months to be served concurrently with Counts 3 and 8; and for Count 10, having weapons while under disability, 36 months to be served concurrently to Counts 3, 8, and 9, for an aggregate prison sentence of 18 years to life in prison.  The trial court advised Leegrand that he will be subject to five years of mandatory postrelease control upon his release from prison and informed him of the consequences if he were to violate its terms.  The trial court also notified Leegrand that upon his release from prison, he will be required to register his address with the sheriff of the county in which he resides to maintain registry on the violent offender database for ten years.  Lastly, the trial court entered judgment against Leegrand for the costs of prosecution.

{¶ 49} The trial court then ordered Leegrand's sentence in this case to run consecutively to Leegrand's sentence in a separate case for which he was currently serving time, CR-16-608028.

{¶ 50} It is from this judgment that Leegrand now appeals.

## II. Law and Argument

### A. Sufficiency of the Evidence

{¶ 51} In his first assignment of error, Leegrand argues that his convictions were not supported by sufficient evidence in violation of his due process rights. Specifically, Leegrand does not argue that the state failed to present sufficient elements of the crimes of which he was convicted. Rather, he contends that there was insufficient evidence to connect him to Prock's homicide. Thus, Leegrand argues only that the state failed to present sufficient evidence of his identity in these crimes.

{¶ 52} Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient

evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 53} Both direct and circumstantial evidence may support a conviction. *Brook Park v. Gannon*, 2019-Ohio-2224, 137 N.E.3d 701, ¶ 24 (8th Dist.). As we explained in *Gannon*,

> "Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.*; *see also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.").
>
> Circumstantial evidence and direct evidence inherently possess the same probative value. [*State v.*] *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 [(1991),] paragraph one of the syllabus. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence — circumstantial evidence carries the same weight as direct evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 2001-Ohio-4, 739 N.E.2d 749 (2001). "Since circumstantial evidence and direct evidence are indistinguishable so far as the * * * fact-finding function is concerned, all that is required of the [factfinder] is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Jenks* at 272. "'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying, and

persuasive than direct evidence.'" *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

*Id.* at ¶ 24-25.

**{¶ 54}** Leegrand argues that there was insufficient evidence that he caused Prock's death because Givhan was the only witness to place him on the scene, and her testimony was not credible because she was hoping that her testimony in this case would reduce her five-year prison sentence, which she was currently serving in Lake County for a separate offense. Under a sufficiency challenge, however, an appellate court does not weigh the credibility of witnesses but rather considers "whether, if believed, the evidence against the defendant would support a conviction." *State v. Dyer*, 8th Dist. Cuyahoga No. 88202, 2007-Ohio-1704, ¶ 24.

**{¶ 55}** Givhan testified that on June 11, 2015, she was with friends on Bridge Avenue where she saw Leegrand and talked to him for a few minutes. She had known Leegrand for a few years. She testified that she saw Leegrand cross Bridge Avenue, a car pull up at the corner of West 59th Street and Bridge Avenue, the driver exit the car, Leegrand and the driver talk, and the driver get back into his car and turn on West 59th Street toward Ellen Avenue. She testified that she watched Leegrand shoot at the car once, wait about three seconds, and fire eight more shots. She testified that she approached the vehicle after it crashed on Ellen Avenue and noticed that the driver was dying. Witnesses who lived on Ellen Avenue and heard the gunshots and crash stated that they saw a person with dreads walking on Ellen Avenue. One of the Ellen Avenue residents, Carney, identified a photo of Givhan as

the person with dreads who he saw on the night of the murder. Without weighing Givhan's credibility, we find that her testimony was sufficient to establish beyond a reasonable doubt that Leegrand was the one who shot at Prock's vehicle, hit him with a single bullet, and caused his death.

{¶ 56} Leegrand further argues that there was no DNA to connect him to Prock's homicide, nobody tried to match his voice with the individual who called Nunzio's to order pizza delivery, and that he did not own the phone connected to this homicide. With respect to DNA evidence, the state was not required to use it to prove Leegrand's identity. *State v. Holloway*, 2d Dist. Clark No. 2017-CA-91, 2018-Ohio-4636, ¶ 71. Moreover, the state is not required to present direct evidence to sustain a conviction, and circumstantial evidence "is to be accorded the same weight" as direct evidence. *State v. Lewis*, 8th Dist. Cuyahoga No. 95964, 2011-Ohio-6155, ¶ 41. FBI staff operations specialist Wilson testified that the phone found at the scene belonged to Sepulveda, who testified that his phone had been stolen. Operations specialist Wilson testified that on June 10 and June 11, 2015, the phone found at the scene had called both Nunzio's and Asia Thomas, who testified that she and Leegrand had been talking "here and there" at that time. This evidence was sufficient to connect Leegrand to the broken flip phone that was found on Bridge Avenue.

{¶ 57} Further, despite the lack of DNA evidence and voice recognition, the state presented overwhelming evidence sufficient to establish that Leegrand is the person who shot and killed Prock. Carney testified that after hearing gunshots on

June 11, 2015, he saw an individual with a goatee and "poofy hair" leaving the scene, and many witnesses described Leegrand as having facial hair and a curly "fro" in 2015. In addition to Givhan's testimony that she saw Leegrand shoot at Prock's vehicle, Leegrand's girlfriend, Watson, and his friend, Kelley, both testified that Leegrand told them that he was responsible for the death of the pizza delivery man. In fact, Watson testified that Leegrand told her that it was a "drug deal gone bad," that Prock took drugs from him and drove away without paying for them, and that he shot at Prock's vehicle. Watson further testified that she called Leegrand's aunt when she was hysterical and that Watson called her from the Summit County jail and yelled at her for doing so. Leegrand's aunt testified that Watson called her and that Leegrand called her from jail and confirmed that he told Watson "exactly what was said."

{¶ 58} The state also presented sufficient evidence connecting Leegrand to the Hi-Point gun that was found in an oven in an Akron townhome that Leegrand had visited with his friend, Rio. The state established that the spent shell casings found on Bridge Avenue were fired from the Hi-Point gun. Watson identified the Hi-Point gun as the gun that Leegrand had when he visited her on her mother porch to tell her about the "drug deal gone bad." Givhan also testified that the gun that Leegrand used to shoot at Prock's vehicle was "like a Hi-Point" gun.

{¶ 59} After review, we find that the state presented overwhelming direct and circumstantial evidence that if believed, was sufficient to establish beyond a

reasonable doubt that Leegrand was the person who shot and killed Prock.  We therefore overrule Leegrand's first assignment of error.

**B. Manifest Weight of the Evidence**

{¶ 60} In his second assignment of error, Leegrand argues that his convictions were against the manifest weight of the evidence.

{¶ 61} A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion.  *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541.  "When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a 'thirteenth juror' and may disagree with the factfinder's resolution of conflicting testimony."  *Tibbs*, 457 U.S. at 42, 102 S.Ct. 2211, 72 L.E.2d 652.  On review of a manifest-weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).  "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."  *Id.*

{¶ 62} Leegrand essentially raises the same questions about his identity in this assignment of error as he did with respect to sufficiency of the evidence.  Leegrand argues that all of his convictions were against the manifest weight of the evidence because Givhan's testimony was unreliable, no DNA evidence connected

Leegrand to Prock's homicide, and Hearst testified that Leegrand had a broken leg and foot in June 2015 and was at her home every night by midnight during that time. We disagree that Leegrand's convictions were against the weight of the evidence.

{¶ 63} Although Givhan was motivated to testify for her personal benefit to decrease her prison sentence, the jury did not clearly lose its way in choosing to believe her testimony. Carney testified that somebody with dreads was on the homicide scene on June 11, 2015, and Givhan identified a photo of herself with dreads from 2015. Isner likewise testified that Carney and an African-American female stopped at Prock's vehicle. Other than whether Givhan spoke to the 911 operator, Givhan's testimony is consistent with Carney's. She and Carney both testified that she approached Prock's car, that Carney called 911, and that Givhan left the scene in her red vehicle before police arrived.

{¶ 64} Further, we do not find that a lack of DNA or direct physical evidence renders Leegrand's convictions against the manifest weight of the evidence. Indeed, as we set forth in the previous assignment of error, the state presented overwhelming evidence of Leegrand's guilt.

{¶ 65} As to Leegrand's argument that Hearst testified that he had injured his leg and foot and was at her home every night in June 2015, every other witness who saw him testified that Leegrand was not in a boot or on crutches in June 2015. Moreover, Hearst's testimony regarding Leegrand's supposed injuries was vague and incomplete. She could not remember exactly when in June 2015 he broke his

leg and foot, and she admitted that she did not know if he broke them before June 10 or 11, 2015.  She could not even recall which hospital he visited.

{¶ 66} After review, we cannot say that this is the exceptional case where the jury clearly "lost its way," and we find that Leegrand's convictions were not against the manifest weight of the evidence.  Accordingly, we overrule Leegrand's second assignment of error.

### C. Confrontation Clause

{¶ 67} In his third assignment of error, Leegrand argues that "[t]he trial court erred in the admission of hearsay evidence and testimonial statements, in violation of [his] right to confront his accusers[.]"  Leegrand contends that Ford's testimony that she called Leegrand's mother and told her that "her son killed the pizza man" was a testimonial, hearsay statement because it repeated what Watson told her, which violated Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶ 68} We review alleged violations of the Confrontation Clause de novo. *State v. Smith*, 162 Ohio App.3d 208, 2005-Ohio-3579, 832 N.E.2d 1286, ¶ 8 (8th Dist.).

{¶ 69} The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]"  The United States Supreme Court has interpreted this to mean that the admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is

testimonial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶ 70} Watson, the original declarant, testified at trial and was subject to cross-examination. Because Leegrand was able to, and in fact did, cross-examine Watson, his confrontation rights were not violated. *See Cleveland v. Amoroso*, 8th Dist. Cuyahoga No. 100983, 2015-Ohio-95, ¶ 38.

{¶ 71} Moreover, the trial court gave a curative instruction for the jury to disregard Ford's statement that she told Leegrand's mother that he "killed the pizza man." Leegrand contends that the instruction was insufficient because the jury still heard the statement, and he should have been entitled to a mistrial and have his convictions overturned. The decision whether to grant a mistrial rests within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001-Ohio-4, 739 N.E.2d 749; Crim.R. 33. "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened[.]" *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). We find that the trial court did not abuse its discretion in denying Leegrand's motion for a mistrial. After the trial court instructed the jury to disregard Ford's statement that she heard from Watson that Leegrand "killed the pizza man," Watson herself took the stand, testified to her conversation with Ford, and was

cross-examined by Leegrand. We therefore overrule Leegrand's third assignment of error.

### D. Consecutive Sentences

{¶ 72} In his fourth assignment of error, Leegrand argues that the trial court erred in imposing consecutive sentences by failing to make the required findings under R.C. 2929.14 and HB 86 and by failing to journalize its findings in its sentencing entry.

{¶ 73} For felony sentences, an "appellate court's standard for review is not whether the sentencing court abused its discretion." R.C. 2953.08(G)(2). Instead, R.C. 2953.08(G)(2) provides that appellate courts "may increase, reduce, or otherwise modify a sentence * * * or may vacate the sentence and remand the matter to the sentencing court for resentencing" if the reviewing court "clearly and convincingly" finds that (a) "the record does not support the sentencing court's findings under [R.C. 2929.14(C)(4)]," or that (b) "the sentence is otherwise contrary to law."

{¶ 74} As the Ohio Supreme Court has explained, when reviewing consecutive sentences, "R.C. 2953.08(G)(2)(a) directs the appellate court 'to review the record, including the findings underlying the sentence' and to modify or vacate the sentence 'if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under' " R.C. 2929.14(C)(4); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28, quoting R.C. 2953.08(G)(2)(a).

{¶ 75} A defendant can challenge consecutive sentences on appeal in two ways. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the necessary findings required by R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(b); *State v. Nia*, 2014-Ohio-2527, 15 N.E.3d 892, ¶ 16 (8th Dist.). Second, the defendant can argue that the record does not support the court's findings made pursuant to R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(a); *Nia* at ¶ 16. Leegrand raises the first argument on appeal.

{¶ 76} "In Ohio, sentences are presumed to run concurrent to one another unless the trial court makes the required findings under R.C. 2929.14(C)(4)." *State v. Gohagan*, 8th Dist. Cuyahoga No. 107948, 2019-Ohio-4070, ¶ 28. Trial courts must therefore engage in the three-tier analysis of R.C. 2929.14(C)(4) before imposing consecutive sentences. *Id.* First, the trial court must find that "consecutive service is necessary to protect the public from future crime or to punish the offender." Second, the trial court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* Third, the trial court must find that at least one of the following applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the

courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Id.*

{¶ 77} The failure to make the above findings renders the imposition of consecutive sentences contrary to law. *Gohagan* at ¶ 29. R.C. 2929.14(C)(4) directs that for each step of this analysis, the trial court must "find" the relevant sentencing factors before imposing consecutive sentences. R.C. 2929.14(C)(4). Trial courts, however, do not need to recite the statutory language word for word. *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 29. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Id.* A trial court "has no obligation to state reasons to support its findings," but the necessary findings "must be found in the record and [] incorporated into the sentencing entry." *Id.* at ¶ 37.

{¶ 78} Here, the trial court ordered that the sentence in this case is to run consecutively to Leegrand's sentence in a separate case, CR-16-608028, for which Leegrand was already serving prison time. The trial court made the following findings at Leegrand's sentencing hearing:

I find that the consecutive term is necessary to protect the public from future crime and to punish the defendant. The consecutive sentences are not disproportionate to the seriousness of the defendant's conduct and to the danger the defendant poses to the public, and the defendant's history of criminal conduct demonstrates that the

consecutive sentences are necessary to protect the public from future crime by the defendant.

Accordingly, the trial court made the requisite R.C. 2929.14(C)(4) findings.

{¶ 79} Moreover, the record clearly and convincingly supports the trial court's findings. The trial testimony shows the seriousness of Leegrand's conduct. His presentence investigation report shows that he has an extensive criminal history. As a juvenile, Leegrand was convicted, in five separate cases, of crimes including assault, robbery, misuse of credit cards, and felonious assault. As an adult, Leegrand was convicted, in six different cases, of crimes including theft, assault, aggravated assault (a fourth-degree felony), receiving stolen property (a fifth-degree felony), and felonious assault (a first-degree felony). The presentence investigation report shows that in July 2016, Leegrand was convicted and sentenced to three years in prison for robbery with a firearm specification, abduction (a third-degree felony), and having weapons while under disability (a third-degree felony). The report identifies Leegrand's recidivism risk level as "high."

{¶ 80} We agree with Leegrand, however, that the trial court failed to include its consecutive-sentence findings in the sentencing entry as required by *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at ¶ 37. Such an error is a clerical mistake that the trial court may correct through a nunc pro tunc entry "to reflect what actually occurred in open court." *Id.* at ¶ 30.

{¶ 81} We therefore sustain Leegrand's fourth assignment of error in part and overrule it in part.

**E. Improper Sentence**

{¶ 82} In his fifth and final assignment of error, Leegrand argues that "[t]he trial court erred by ordering Appellant to serve an improper sentence" because the trial court sentenced him to "life in prison with the possibility of parole in 15 years" rather than "an indefinite term of fifteen years to life" as required by R.C. 2929.02 as the penalty for murder.  We agree.

{¶ 83} Pursuant to R.C. 2929.02(B)(1), a person convicted of murder in violation of R.C. 2903.02 "shall be imprisoned for an indefinite term of fifteen years to life."  As the Ohio Supreme Court explained in *State v. Fischer,* 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 22,

> Judges have no inherent power to create sentences. *Griffin & Katz*, Ohio Felony Sentencing Law (2008) 4, Section 1:3, fn. 1. *See also Woods v. Telb*, 89 Ohio St.3d [504] at 507-509, 2000-Ohio-171, 733 N.E.2d 1103 [2000] (describing the legislative intent behind a new, comprehensive sentencing structure, including postrelease control). Rather, judges are duty-bound to apply sentencing laws as they are written. *See State v. Thomas* (1996), 111 Ohio App.3d 510, 512, 676 N.E.2d 903. "[T]he only sentence which a trial court may impose is that provided for by statute. A court has no power to substitute a different sentence for that provided for by statute or one that is either greater or lesser than that provided for by law." *Colegrove [v. Burns]*, 175 Ohio St. [437,] 438, 25 O.O.2d 447, 195 N.E.2d 811 [1964].

{¶ 84} When a trial court acting with subject-matter and personal jurisdiction imposes a sentence contrary to law, the sentence is voidable and may be challenged on direct appeal.  *State v. Harper*, Slip Opinion No. 2020-Ohio-2913, ¶ 4, 42.

{¶ 85} In *State v. Kemp*, 8th Dist. Cuyahoga No. 97913, 2013-Ohio-167, this court held that Kemp's sentence for murder of "life in prison with eligibility of parole

after 15 years" was contrary to law because R.C. 2929.02(B)(1) required that Kemp be imprisoned "for an indefinite term of fifteen years to life." Similarly, in *State v. Duncan*, 2d Dist. Clark No. 2016-CA-77, 2017-Ohio-8103, the Second District held that Duncan's murder sentence of "life with the possibility of parole after fifteen (15) years plus a one (1) year firearm specification to be served consecutive" was contrary to R.C. 2929.02(B)(1)'s language of "indefinite term of fifteen years to life."

{¶ 86} In *State v. Smith*, 2019-Ohio-155, 131 N.E.3d 321, ¶ 24 (8th Dist.), this court faced the reverse situation: Smith was convicted of aggravated murder but was sentenced to "20 years to life" instead of R.C. 2929.03(A)'s language of "life imprisonment with parole eligibility after serving twenty years of imprisonment." *Id.* at ¶ 3, 16. This court vacated Smith's sentence and remanded for resentencing, explaining,

> the trial courts in *Kemp* and *Duncan* erred by imposing a sentence on a murder conviction that more closely resembled the type of sentence that is appropriate for an aggravated murder conviction under R.C. 2929.03(A), i.e., a prison term of life with parole eligibility after a certain period of time. *See* R.C. 2929.03(A)(1)(b)-(d). * * * [T]he decisions demonstrate the legislatively constructed differences between the sentence permitted for aggravated murder and the sentence permitted for murder.

*Id.* at ¶ 24; *see also State v. Dowdy*, 8th Dist. Cuyahoga No. 107844, 2019-Ohio-3570, ¶ 8 (relying on *Smith* to vacate Dowdy's sentence as void).[4]

---

[4] The state appealed our order, and the Ohio Supreme Court accepted the discretionary appeal. *State v. Dowdy*, *1/21/2020 Case Announcements*, 2020-Ohio-122, 137 N.E.3d 1200. Oral argument has not yet been scheduled.

{¶ 87} Here, the trial court stated at the sentencing hearing that for Count 3, murder, it was imposing a sentence of "life in prison with possibility of parole in 15 years." The trial court then sentenced Leegrand to three years for the gun specification and ordered that it be served prior to and consecutive to Count 3. The sentencing journal entry states that Leegrand's murder sentence is "3 years on firearm spec to run prior to and consecutive to Count 3 life in prison with eligibility of parole after 15 years." This is contrary to the "indefinite term of fifteen years to life" language of R.C. 2929.02(B)(1).

{¶ 88} The state argues that Leegrand's sentence should be upheld because there is no practical effect between the difference in language. This court rejected such an argument in *Smith*, finding "the legislature's construction of the R.C. 2929.03(A) and 2929.02(B), and its decision to use different statutory language in each sentencing statute, was intentional. One expressly sets forth parole eligibility by statute, the other does not." *Id.* at ¶ 25; *see also State v. Reed*, 8th Dist. Cuyahoga No. 108498, 2019-Ohio-4471, ¶ 37, 38 (relying on *Smith* to reject the state's argument that "20 years to life" had the same practical effect as "life imprisonment with parole eligibility after serving twenty years of imprisonment.").[5] We are obligated to follow our precedent in both *Reed* and *Smith* and reject the state's argument here that Leegrand's sentence should be upheld because it has the same practical effect as the statutory language of R.C. 2929.02.

---

[5] The state appealed our decision in *Reed*, and the Ohio Supreme Court has accepted the discretionary appeal. *State v. Reed*, *1/21/2020 Case Announcements*, 2020-Ohio-122, 137 N.E.3d 1214. Oral argument has not yet been scheduled.

**{¶ 89}** Accordingly, we sustain Leegrand's final assignment of error.

**{¶ 90}** Judgment affirmed in part, reversed in part, and remanded. Specifically, Leegrand's convictions are affirmed, but his sentence for murder is vacated and remanded. Upon remand, the trial court is to (1) hold a resentencing hearing at which Leegrand is to be sentenced for Count 3, murder, in accordance with the statutory language set forth in R.C. 2929.02; and (2) correct the portion of its sentencing entry via nunc pro tunc to include the findings required by R.C. 2929.14(C)(4) when ordering Leegrand's sentence in this case to run consecutively to his sentence in CR-16-608028.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court to hold a resentencing hearing and issue a nunc pro tunc entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR