[Cite as *State v. Garcia-Rodriguez*, 2022-Ohio-4283.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 111038 |
| v. | : | |
| WILFREDO GARCIA-RODRIGUEZ, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 1, 2022

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-625204-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Kevin R. Filiatraut, Assistant Prosecuting
Attorney, *for appellee.*

Edward M. Heindel, *for appellant.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Defendant-appellant Wilfredo Garcia-Rodriguez ("Garcia-Rodriguez"), appeals from his convictions and sentencing following a jury trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On January 26, 2018, in Cuyahoga C.P. No. CR-18-625204-A, a Cuyahoga County Grand Jury indicted Garcia-Rodriguez on one count of aggravated murder in violation of R.C. 2903.01(B), one count of aggravated murder in violation of R.C. 2903.01(A), one count of aggravated burglary in violation of R.C. 2911.11(A)(1), one count of aggravated robbery in violation of R.C. 2911.01(A)(3), one count of aggravated robbery in violation of R.C. 2911.01(A)(1), two counts of kidnapping in violation of R.C. 2905.01(A)(2), one count of kidnapping in violation of R.C. 2905.01(A)(3), and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2). Except for the charge of having weapons while under disability, the charges carried one- and three-year firearm specifications, notice of prior conviction specifications, and repeat violent offender specifications.

{¶ 3} On January 31, 2018, Garcia-Rodriquez pleaded not guilty to the indictment. On July 31, 2018, the court granted a motion to appoint an interpreter on behalf of Garcia-Rodriguez. On September 11, 2018, the trial court referred Garcia-Rodriguez for an evaluation by the court psychiatric clinic. On April 16, 2019, a plea offer was placed on the record. On August 1, 2019, Garcia-Rodriguez filed a motion for an independent psychological evaluation and appointment of a specific psychologist to assist in his defense. On August 6, 2019, the trial court denied Garcia-Rodriguez's request for a specific psychologist but granted his request to undergo a supplemental psychological evaluation with the court psychiatric clinic.

On November 19, 2019, following a hearing, the trial court found Garcia-Rodriguez competent to stand trial.

{¶ 4} Between March 2, 2020, and January 22, 2021, the court observed Covid-19 protocols, granted continuances on pretrial hearings and trial dates, and held pretrial hearings. On April 6, 2021, Garcia-Rodriguez filed a motion to suppress the videotaped recordings of his custodial interrogations that took place on January 16, 2018, and January 17, 2018. On June 7, 2021, the court held a hearing on the motion to suppress, and the court subsequently denied Garcia-Rodriguez's motion.

{¶ 5} On September 13, 2021, Garcia-Rodriguez waived his right to a jury trial on Count 9, having weapons while under disability charge, and the repeat violent offender and notice of prior conviction specifications associated with Counts 1 through 8 of the indictment. On the same date, the case proceeded to a jury trial on the remaining charges.

{¶ 6} The charges against Garcia-Rodriguez arose from an incident on January 7, 2018, that resulted in the murder of James Dowell ("Jimbo"). The following summaries describe the trial testimony offered by the participants, witnesses, and investigating officers.

**E.R.**

{¶ 7} Garcia-Rodriguez lived with his girlfriend, Cassandra Roman, and her family members including her 14-year-old son E.R. E.R. considered Garcia-

Rodriguez a father-figure until several months prior to this incident when their relationship began to deteriorate due to Garcia-Rodriguez's use of crack cocaine.

{¶ 8}   E.R. testified that as he walked home from his cousin's house on January 7, 2018, he observed his mom's car parked in the driveway of a house he passed. E.R. did not know who lived at the home, but he knocked on the front door to inquire why his mom's car was parked there. Garcia-Rodriguez answered the door; Garcia-Rodriguez was accompanied by another man, Tito.[1]  This was E.R.'s first encounter with Tito although he may have observed Tito with Garcia-Rodriguez on a few prior occasions. Both Garcia-Rodriguez and Tito were dressed in black and wore gloves. Garcia-Rodriguez informed E.R. that the men planned to rob Jimbo. The men instructed E.R. to get into Tito's green Honda Accord because he could help them with the robbery.

{¶ 9}   Inside the car, Tito sat in the driver's seat with Garcia-Rodriguez in the front passenger seat and E.R. in the rear seat. Tito pointed a baby blue gun at E.R. and threatened to kill his family if E.R. told anyone about the robbery. Tito gave E.R. ten dollars with which he was to purchase marijuana from Jimbo. E.R. knew Jimbo both as a family friend with whom E.R. had been acquainted with since he was five years old and as E.R.'s marijuana dealer. Tito drove to Jimbo's house and parked in the alley behind the home. E.R. denied that he or anyone else called Jimbo as they drove to Jimbo's home.

---

[1] Tito's given name is Juan Burgos-Delgado.

{¶ 10} Garcia-Rodriguez instructed E.R. to knock on Jimbo's back door, enter the house, and purchase marijuana. E.R. knocked at the back door, and Jimbo permitted him entry to the house. A female friend of Jimbo's, Savannah Alley ("Savannah"), was also present in the kitchen. As E.R. handed Jimbo money for the drugs, Garcia-Rodriguez and Tito entered the back door wearing face masks and carrying guns.

{¶ 11} Garcia-Rodriguez and Tito ordered Jimbo, Savannah, and E.R. to get on the ground. Garcia-Rodriguez pointed his gun at Jimbo and demanded he hand over marijuana and money. Garcia-Rodriguez and Jimbo fought over possession of the gun while Tito stood to the side and pointed his gun at Jimbo. During the struggle between Garcia-Rodriguez and Jimbo, Garcia-Rodriguez's gun was pointed at E.R. which caused E.R. to stand up and lean against the wall. Garcia-Rodriguez's gun went off although no one was shot. Savannah stood up and ran from the room. Tito picked up Garcia-Rodriguez's gun from the ground, pistol-whipped Jimbo and shot Jimbo twice with that gun — once in the upper arm and once in the head. E.R. testified that at some point, Tito removed a roll of duct tape from his pocket and attempted to wrap tape around Jimbo's arm. E.R. also testified that while these acts took place, Garcia-Rodriguez and Tito spoke in Spanish, which E.R. did not understand.

{¶ 12} After Tito shot Jimbo, Tito pointed the gun at E.R. and told him to grab the marijuana bag from the kitchen table and get in the car. E.R. complied with those demands. E.R. gave conflicting testimony as to how Tito and Garcia-

Rodriguez left the house. E.R. initially stated that he left first, followed by Tito holding the gun and then Garcia-Rodriguez. E.R. later testified that Garcia-Rodriguez left the house first followed by himself and then Tito.

{¶ 13} Tito drove the three individuals from Jimbo's house back to Tito's house. E.R. described Tito as "very excited" during the drive while Garcia-Rodriguez sat quietly. Upon arriving at Tito's home, E.R. exited the car, walked home, and never spoke with anyone about the events that took place at Jimbo's home until January 16, 2018, when E.R. was approached by the police.

{¶ 14} On January 16, 2018, Cleveland Police Detective Jody Remington ("Detective Remington") and FBI Special Agent Brian Young ("Agent Young") questioned E.R. at his school. E.R. testified that he was not initially honest with Detective Remington and Agent Young because he was scared, he wanted to protect Garcia-Rodriguez, and he feared Tito. E.R.'s lies included statements that he did not know Tito or maybe he had seen him around; that Garcia-Rodriguez and Tito picked E.R. up while he was walking and he thought they were going to Jimbo's to buy marijuana; that E.R. called Jimbo from his friend's home; that E.R. was lying face-down during the robbery and he did not see anything; and that E.R. never saw Tito's face unmasked. After being questioned and returning home, E.R. told Garcia-Rodriguez that he had spoken with Detective Remington and Agent Young. Garcia-Rodriguez contacted the police, and both Garcia-Rodriguez and E.R. turned themselves into the police that night.

{¶ 15} E.R. was charged with and pled guilty to murder. As part of the plea agreement, the state agreed not to attempt bindover, which could result in E.R. being tried in adult court, and E.R. agreed to testify against Garcia-Rodriguez and Tito. E.R.'s probation was dependent upon his trial testimony.

**Savannah Alley**

{¶ 16} Savannah testified that she was Jimbo's best friend and she accompanied him daily when he sold marijuana either outside or inside his home. On January 7, 2018, Savannah and Jimbo were completing drug sales outside his house when Jimbo received a phone call from E.R.. E.R. wanted to meet Jimbo at his home and purchase marijuana. Jimbo and Savannah smoked marijuana on their way back to Jimbo's home; Savannah was high during the events that occurred that evening.

{¶ 17} While Savannah and Jimbo were in the kitchen, E.R. knocked at the back door and Jimbo let him into the house. Jimbo asked E.R. where Garcia-Rodriguez was, and E.R. stated he did not know. Savannah had seen Jimbo sell marijuana previously to Garcia-Rodriguez, and on one such occasion, E.R. was with Garcia-Rodriguez. While Jimbo weighed marijuana at the kitchen table, two masked men entered the house. Savannah did not identify the men but differentiated them by describing one as chubby and the other as skinny. Savannah testified the skinny assailant's build was comparable to Garcia-Rodriguez's build.

{¶ 18} Upon the men's entry into the house, the chubby assailant put Savannah's hands behind her back, a gun to her head, and forced her to the ground.

E.R. stood in the kitchen as Jimbo fought with the skinny man. The two assailants spoke in Spanish and English to each other. She heard Jimbo state, "Gyto, why are you doing this to me" and "Gyto, why would you do this to me, and we're family." Gyto is Garcia-Rodriguez's nickname.

{¶ 19} Savannah testified that one of the men pistol-whipped Jimbo and Jimbo continued to struggle with his captors. The assailants attempted to duct tape Jimbo. While Jimbo and Savannah were both on the ground and both captors were struggling with Jimbo, the first gunshot was fired. Savannah promptly stood up, ran out of the room, and hid in the bedroom behind the television set. Savannah heard a couple of additional gunshots, but she did not see who shot Jimbo. After she heard the assailants' car drive away, Savannah left her hiding place and discovered Jimbo's body lying in a pool of blood on the kitchen floor.

{¶ 20} After the police arrived, Savannah was interviewed at the Justice Center. Savannah told the police that she observed two guns — a light blue one and a dark blue one. She also informed the interrogating officer that "I'm going to be remembering things from here on out, I'm going to be remembering things I may not remember right now, but I'm going to remember things." Tr. 581. Savannah testified that immediately after Jimbo's death, his family suspected Savannah's involvement with the robbery and murder although she does not think they still hold those beliefs.

**Garcia-Rodriguez**

{¶ 21} Garcia-Rodriguez testified that he was born in Puerto Rico where he completed the ninth grade. Garcia-Rodriguez's first language is Spanish, and he claimed to speak very little English. Garcia-Rodriguez was previously convicted in criminal cases in Ohio for which he served four years in prison. Garcia-Rodriguez stated that he lived with E.R. and his family for almost two years prior to Jimbo's death. Garcia-Rodriguez considered E.R. a son to him. Jimbo was a family friend to E.R. and his family, but Garcia-Rodriguez knew him mainly as his supplier of marijuana.

{¶ 22} Garcia-Rodriguez initially testified that he first met Tito when Garcia-Rodriguez was tattooing a mutual friend of theirs. At that encounter, Garcia-Rodriguez agreed to complete construction work at Tito's home. At a later date, Garcia-Rodriguez went to Tito's home where he began the construction work. While Garcia-Rodriguez worked, Tito wore a large, green gun around his waist and asked Garcia-Rodriguez about his family in Puerto Rico. Tito informed Garcia-Rodriguez that he had killed Garcia-Rodriguez's cousin in Puerto Rico and, if Garcia-Rodriguez told anyone about the incident, Tito would also kill him. Garcia-Rodriguez took the threat seriously. Tito followed Garcia-Rodriguez around the house and eventually took Garcia-Rodriguez to the basement where he and Tito smoked crack cocaine. Garcia-Rodriguez testified that Tito then "transformed into a real threat" as he wielded his gun as well as a stick and sword and continued to threaten Garcia-Rodriguez. Garcia-Rodriguez did not feel that he could leave Tito's home.

{¶ 23} While in the basement, Garcia-Rodriguez heard knocking on the house door. Garcia-Rodriguez answered the door and saw E.R. standing there. Garcia-Rodriguez stepped outside, and Tito followed behind, brandishing his gun. Garcia-Rodriguez informed Tito he needed to go home, but Tito told him he needed to pay him money for the drugs Tito had provided to Garcia-Rodriguez.

{¶ 24} Tito forced E.R. and Garcia-Rodriguez into his green Honda Accord; pointed the gun at E.R.; and threatened to kill E.R. if he told anyone about their actions. Tito then mentioned for the first time that he was going to take Garcia-Rodriguez to Jimbo's. After arriving at Jimbo's home, an approximate seven or eight minute drive, Tito parked the car towards the back of the house, pulled out another handgun, handed a ski hat without eye holes to Garcia-Rodriguez, and told Garcia-Rodriguez that he had to steal marijuana from Jimbo in repayment of the money he owed Tito. Tito threatened to kill both Garcia-Rodriguez and E.R. if Garcia-Rodriguez did not comply.

{¶ 25} After E.R. exited the vehicle, Tito handed Garcia-Rodriguez a nonoperational, blue gun and stated "pick this gun, this gun gets stuck sometimes." Tr. 977. Garcia-Rodriguez testified that this was the Kimber gun that was introduced at trial. Tito handed E.R. money and instructed him to enter Jimbo's home ahead of the other two men. E.R. complied with Tito's directives as Garcia-Rodriguez and Tito stood outside Tito's vehicle. Tito stood behind Garcia-Rodriguez with his gun pointed at his rib cage and pushed Garcia-Rodriguez to enter the home. Garcia-Rodriguez thought Tito would kill him.

{¶ 26} At trial, Garcia-Rodriguez offered varying versions of what occurred after they entered Jimbo's home. He initially stated that Tito pushed Garcia-Rodriguez out of the way and Jimbo and Garcia-Rodriguez stumbled to the ground. Tito threw Savannah to the ground and pointed his gun at her. Tito told Garcia-Rodriguez to ask Jimbo where the marijuana was located. Jimbo would not state the marijuana's location so Tito pistol-whipped Jimbo and then tried to restrain Jimbo with duct tape. Garcia-Rodriguez denied that he attempted to duct tape Jimbo and testified his DNA was on the tape because he handled duct tape while working at Tito's house.

{¶ 27} Garcia-Rodriguez also testified that as he entered the house, Jimbo grabbed him and they both fell to the ground. When Garcia-Rodriguez landed on the ground, he lost control of the gun. Tito grabbed the gun and put it in his pant-waist area. Then, while Garcia-Rodriguez and Jimbo were on the ground, Tito used his green gun to shoot Jimbo twice. Tito grabbed the bag of marijuana on the kitchen table and ordered Garcia-Rodriguez and E.R. to get in his car.

{¶ 28} After Jimbo was shot and the men left the house, Garcia-Rodriguez testified that Tito, Garcia-Rodriguez, and E.R. returned to Tito's home where Tito took them to the basement. Tito threatened to kill them and their families if they spoke about the robbery or murder. During the week or so following the robbery and murder, Tito drove by Garcia-Rodriguez's home and yelled "are you doing okay." Garcia-Rodriguez testified that this was slang for Puerto Ricans that meant if you say something you are not supposed to repeat, you will be killed.

{¶ 29} On January 16, 2018, E.R. told Garcia-Rodriguez that he had spoken with detectives at school who said they would protect them from Tito. Garcia-Rodriguez testified that he coincidentally ran into his adult son, Christian, and asked him to serve as a translator with the detectives. Garcia-Rodriguez testified that he wanted to speak with the detectives because he was concerned that they were being threatened by Tito and he knew Tito killed Jimbo. Upon meeting the detectives at a designated location, Garcia-Rodriguez and E.R. were handcuffed and taken into custody.

{¶ 30} Garcia-Rodriguez testified that the officers promised to protect him and his family from Tito if he cooperated with them. Garcia-Rodriguez testified he "felt forced to cooperate." Garcia-Rodriguez stated he consumed marijuana and cocaine prior to his arrest and was under the effects of drugs during the January 16, 2018 interrogation and, therefore, he answered all of the detectives questions in the affirmative. Garcia-Rodriguez also testified that he told the detectives he spoke poor English but they still asked questions and he answered them.

{¶ 31} At trial, Garcia-Rodriguez denied he went to Jimbo's with the intention of robbing Jimbo and denied previously telling the police during his custodial interrogations that he wanted the marijuana from Jimbo's home.

{¶ 32} The Cleveland Division of Police ("CPD") videotaped Garcia-Rodriguez's January 16, 2018 and January 17, 2018 custodial interrogations and the state presented those recordings during trial to impeach Garcia-Rodriguez's trial testimony.

**Detective Raymond Diaz**

{¶ 33} Detective Raymond Diaz ("Detective Diaz"), a homicide detective with CPD, testified that he investigated Jimbo's homicide along with Detective Remington and Special Agent Young. Detective Diaz interviewed Savannah and collected evidence. CPD learned the street names of the individuals that may have been involved in the crimes: Gyto and Tito. With Savannah's assistance, CPD obtained information on Gyto and E.R. on Facebook and determined Garcia-Rodriguez's street name was Gyto.

{¶ 34} Detective Diaz testified that Detective Remington and Special Agent Young interviewed E.R. at school on January 16, 2018. Following that interview, the CPD obtained a warrant to arrest Garcia-Rodriguez. Before they could arrest him, Garcia-Rodriguez contacted Detective Remington and requested to meet with her. The CPD met with Garcia-Rodriguez and E.R. at a predetermined location, and the two individuals were arrested without incident.

{¶ 35} Detective Diaz testified that Garcia-Rodriguez was interviewed on January 16, 2018, and was interviewed again the following day by a Spanish-speaking officer and Detective Remington. The first interview was conducted in English by Detective Diaz and Special Agent Young, who do not speak Spanish. Garcia-Rodriguez told Detective Diaz and Special Agent Young that if he was spoken to slowly, he could understand English. Detective Diaz testified that Garcia-Rodriguez "seemed to be answering the questions that I asked." However, because English was Garcia-Rodriguez's second language, CPD arranged for a second

interview with a Spanish-speaking officer. During his interview of Garcia-Rodriguez, Detective Diaz learned of Tito's identity and the allegation that Tito shot Jimbo.

{¶ 36} Diaz testified that Tito was arrested and his home was searched pursuant to a warrant. During the search, CPD found a green Honda Accord in the driveway. In the house, they recovered the following items: a Kimber gun; a magazine that contained eight live 33 by 53 rounds, which are the same caliber of the two spent or fired casings recovered at the homicide; three rolls of unopened blue duct tape; and an open roll of blue duct tape in the garage that later was tested and found to contain DNA of Jimbo, Tito, and Garcia-Rodriguez.

**Detective Michael Shay**

{¶ 37} Detective Michael Shay ("Detective Shay"), a crime scene unit detective, testified he was on scene at Jimbo's house on January 7, 2018. In Jimbo's kitchen, he observed a drug scale commonly used to weigh drugs and marijuana residue on the scale. Detective Shay observed a spent cartridge case on the kitchen floor; a spent cartridge case on top of the washing machine; duct tape on the floor near Jimbo's feet; an additional roll of duct tape with a piece removed and crumpled; and a bullet recovered from under Jimbo's body. In the alley behind Jimbo's home, Detective Shay photographed two areas of suspected blood in the snow; a knit winter hat without eye holes; and discarded duct tape in the street.

**Detective Jerome Krakowski**

{¶ 38} Detective Jerome Krakowski ("Detective Krakowski") responded to Jimbo's home and secured the scene. Upon arrival, he observed Savannah whom he described as frantic, emotional, and obviously distraught. The state introduced Detective Krakowski's body camera footage at trial.

**Dr. Joseph Felo**

{¶ 39} Dr. Joseph Felo ("Dr. Felo"), the Chief Deputy Medical Examiner for Cuyahoga County, observed Jimbo's body at his house and subsequently performed the autopsy. According to Dr. Felo, Jimbo died from a gunshot wound that entered the back of his head and exited above his right eye. He also had a nonlethal gunshot wound that went through his right upper arm. Jimbo suffered nonlethal blunt injuries on his head, arms, and legs that were sustained before the time of death. The injuries to Jimbo's head were consistent with blows from a fist or being struck by a pistol handle or the side of the handgun's muzzle. Felo conceded Jimbo's injuries could have also been sustained hitting the floor, a wall, or a piece of furniture. Felo noted stipple wounds on the left side of Jimbo's face and in front of his left ear indicating that a handgun was discharged in close proximity to the left side of his face. Felo stated it was possible the stippling occurred when the decedent lifted his arm in a defensive movement, but he could not make that conclusion with any degree of scientific certainty. Toxicology results showed Jimbo was under the influence of marijuana at the time of his death.

**Curtiss Jones**

{¶ 40} Curtiss Jones ("Jones") testified as to his work as the supervisor of the Trace Evidence Unit with the Cuyahoga County Medical Examiner's forensic laboratories. Jones testified that the discarded duct tape sections found at the crime scene could have come from the roll of duct tape found in Tito's house, but he could not determine that with any certainty.

**Lisa Moore**

{¶ 41} Lisa Moore ("Moore"), a DNA analyst for the county, testified that Jimbo's and Garcia-Rodriguez's DNA was found on the roll of gray duct tape; this item did not contain DNA of Tito. The recovered section of blue duct tape contained Jimbo's DNA. The blood stains in the snow contained Jimbo's DNA. The blue duct tape recovered by the police on January 19, 2018, from Tito's home contained DNA from Tito, Jimbo, and Garcia-Rodriguez, with their respective contribution to the DNA being approximately 50%, 30%, and 20%. The knit cap recovered outside Jimbo's home contained Garcia-Rodriguez's DNA. The baggie of suspected narcotics recovered from Tito's house contained Tito's DNA.

**Kristen Koeth**

{¶ 42} Kristen Koeth ("Koeth") was employed as a firearm tool mark examiner in the firearms section of the Cuyahoga County Regional Forensic Science Laboratory. Koeth completed firearm testing on the evidence related to Jimbo's homicide.

{¶ 43} Koeth analyzed two spent cartridge cases, one fired bullet, and one damaged bullet collected from Jimbo's home. Koeth also analyzed a blue-green colored Kimber Special Edition pistol with a six-round magazine containing six auto caliber cartridges, an eight-round magazine containing eight Tokarev caliber cartridges, and a box of 49 auto caliber cartridges collected from Tito's home.

{¶ 44} Koeth's conclusions, within a reasonable degree of scientific certainty within the field of tool mark and firearm examination, included (1) the two spent cartridge cases were fired by the same Tokarev caliber firearm; (2) she could not state whether the fired bullet came from either of the spent cases; (3) the Kimber gun could not have fired the Tokarev cartridges nor the two spent cartridge cases or bullet that were recovered at Jimbo's home; (4) three live rounds recovered from the eight-round magazine were cycled through the same firearm as the two spent cartridge cases found at the crime scene; and (5) Koeth was not provided a handgun that could have fired the Tokarev rounds.

{¶ 45} Following the state's case-in-chief, Garcia-Rodriguez made a Crim.R. 29 motion that the court denied. On September 23, 2021, Garcia-Rodriguez was found guilty of Count 1, murder — the lesser included offense — in violation of R.C. 2903.02(B), and the notice of prior conviction and repeat violent offender specifications; Count 3, aggravated burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree, with one- and three-year firearm specifications, notice of prior conviction specifications, and repeat violent offender specifications; and Count 9, having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony

of the third degree. Garcia-Rodriguez was found not guilty on all other charges. The court referred Garcia-Rodriguez to the probation department for a presentence investigation report.

{¶ 46} On October 28, 2021, the court sentenced Garcia-Rodriguez to life with parole eligibility after serving 15 years on Count 1; 11 years on Count 3; and 36 months on Count 9, for a total of 29 years to life. Count 3's one-year firearm specification merged into the three-year firearm specification, and the three-year firearm specification was to be served prior to and consecutive to Count 3's base charge. Counts 1 and 3 were to be served consecutively to each other, and Count 9 was to be served concurrently to Counts 1 and 3. The court addressed post-release control, the R.C. 2929.12 statutory requirements on consecutive sentencing, and the right to appeal.

{¶ 47} On November 22, 2021, Garcia-Rodriguez filed a timely appeal presenting seven assignments of error for our review:

> Assignment of Error 1. The trial court erred in denying Appellant's motion to suppress statements when the police failed to secure an interpreter in contravention of its own policies.
>
> Assignment of Error 2. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(a), on the charges, and thereafter entering a judgment of conviction of those offenses as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.
>
> Assignment of Error 3. Appellant's convictions are against the manifest weight of the evidence.

Assignment of Error 4. The trial court infringed upon and violated Appellant's right to remain silent and right not to testify when it told the jury that it depends on the strength of the State's evidence.

Assignment of Error 5. The trial court erred by ordering convictions and a separate sentence for separate counts because the trial court failed to make a proper determination as to whether those offenses are allied offenses pursuant to R.C 2941.25 and they are part of the same transaction under R.C. 2929.14.

Assignment of Error 6. The trial court erred by ordering Appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and HB 86.

Assignment of Error 7. The trial court erred by imposing an improper sentence on the murder count.

**Legal Analysis**

I. **Motion to Suppress**

{¶ 48} In Garcia-Rodriguez's first assignment of error, he argues that the trial court erred when it denied the motion to suppress his two statements secured by CPD on January 16, 2018, and January 17, 2018. Specifically, Garcia-Rodriguez's primary language is Spanish; his *Miranda* rights and the January 16, 2018 statement were secured by an English-speaking officer in English. Garcia-Rodriguez argues that due to his lack of comprehension of the English language, he did not voluntarily and knowingly waive his *Miranda* rights before submitting to the January 16 custodial interrogation. Garcia-Rodriguez further argues that even though Detective Beverly Fraticelli ("Detective Fraticelli") participated as a Spanish interpreter during the January 17 custodial interrogation, that discussion was a continuation of the January 16 interrogation and, therefore, as a "fruit of the

poisonous tree" it also should have been suppressed by the trial court. Garcia-Rodriguez also argues that the use of Detective Fraticelli as an interpreter during his January 17, 2018 custodial interrogation created a conflict of interest. Specifically, Garcia-Rodriguez argues that an independent translator is a neutral party whereas a police officer, acting as a translator, could tailor Garcia-Rodriguez's answers to facilitate the state's case. Garcia-Rodriguez also argued at the motion to suppress hearing that CPD violated a general police order that required the provision of a professional translator during a custodial interrogation where the interviewee's legal rights might otherwise be adversely affected. Garcia-Rodriguez argued that as a Spanish-speaking individual, he needed a professional interpreter present to adequately protect his rights.

{¶ 49} The standard of review on a motion to suppress is as follows:

"Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. In ruling on a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id*., citing *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). On appeal, we "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id*., citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). Accepting these facts as true, we must then "independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

*State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 75.

{¶ 50} "The Fifth Amendment to the United States Constitution and Article I, Section 10, of the Ohio Constitution guarantee that no person in any criminal case

shall be compelled to be a witness against himself." *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 19, citing *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). Additionally, the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), found a suspect in police custody "'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda* at 479.

{¶ 51} To waive one's *Miranda* rights, the waiver must be knowingly, intelligently, and voluntarily made. *Miranda* at 444. The state must demonstrate by a preponderance of the evidence and based on the totality of the circumstances that a defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *State v. Moore*, 2012-Ohio-1958, 970 N.E.2d 1098, ¶ 62 (8th Dist.), citing *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995). "The totality of the circumstances includes 'the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of threat or inducement.'" *Moore* at ¶ 62, quoting *State v. Campbell*, 90 Ohio St.3d 320, 332, 738 N.E.2d 1178 (2000), quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. Without a showing of a voluntary waiver, the waiver is invalid and the defendant's statements should be suppressed. *Id.*

{¶ 52} Under the totality of the circumstances, we find Garcia-Rodriguez's waiver of his *Miranda* rights was made knowingly, intelligently, and voluntarily. Garcia-Rodriguez , a 39-year-old male, was born in Puerto Rico, spoke Spanish as his primary language, and later moved to New York and then Ohio. On January 16, 2018, both the *Miranda* rights and custodial interrogation questions were presented orally, in English, to Garcia-Rodriguez. Garcia-Rodriguez's responses and actions indicated to the detectives that he understood his *Miranda* rights and understood the consequences that would result from his decision to abandon those rights. Garcia-Rodriguez admitted to a prior arrest where he was read his *Miranda* rights; due to that prior arrest, Garcia-Rodriguez served four years in prison on burglary and child endangerment charges. Garcia-Rodriguez initially stated "my English is not good" but that he understood the language when spoken slowly. The officers questioned Garcia-Rodriguez for over an hour during which time Garcia-Rodriguez provided appropriate responses to the posed questions. Garcia-Rodriguez did not require the officers to repeat their questions. Some of Garcia-Rodriguez's responses were rambling in nature. Garcia-Rodriguez appeared emotional throughout the interview, crying on separate occasions and stating his concern for his family's safety from Tito. The officers offered no promises to Garcia-Rodriguez, although they acknowledged that Garcia-Rodriguez feared for his family and, as a result, they needed to find Tito and arrest him. Garcia-Rodriguez's statements indicated he knowingly, intelligently, and voluntarily waived his *Miranda* rights.

{¶ 53} Further, since Garcia-Rodriguez knowingly, intelligently, and voluntarily waived his *Miranda* rights during the January 16, 2018 interrogation, there is no merit to the argument that the January 17, 2018 interrogation was the "fruit of a poisonous tree." Garcia-Rodriguez did not provide any direct or relevant case law to support his contention that the use of a police officer as a translator during the second interview created a conflict of interest. And even assuming CPD acted in derogation of the general police order that required a professional interpreter, the totality of the circumstances demonstrated that those acts did not negatively impact Garcia-Rodriguez knowingly, intelligently, and voluntarily waiving his *Miranda* rights. We note that the better practice would have been for the CPD to follow the general police order and obtain a professional interpreter for Garcia-Rodriguez's custodial interrogations.

{¶ 54} Additionally, we acknowledge that on January 16, 2018, Detective Diaz stated at the conclusion of the custodial interrogation that the CPD was going to (1) speak with him again in the morning; (2) provide a Spanish-speaking officer; and (3) ensure "we are clear on everything. Make it easier." At the start of the January 17, 2018 custodial interrogation, the interviewing officer indicated Detective Fraticelli, a Spanish-speaking officer, was present and "we're not going to have any language barrier today." While these statements suggest the officers could have utilized a Spanish interpreter at both custodial interrogations, the overwhelming evidence supports our finding that Garcia-Rodriguez knowingly, intelligently, and voluntarily waived his *Miranda* rights.

{¶ 55} Based upon the foregoing, we find there was no error as to the trial court's denial of Garcia-Rodriguez's motion to suppress. Accordingly, we overrule Garcia-Rodriguez's first assignment of error.

## II. Sufficiency of the Evidence

{¶ 56} In Garcia-Rodriguez's second assignment of error, he argues that the trial court erred when it denied his Crim.R. 29(A) motion for acquittal and entered a judgment on the convictions. Specifically, Garcia-Rodriguez argues that the state failed to introduce sufficient evidence to support the charges and, therefore, a conviction violated his due process rights. Garcia-Rodriguez further argues that even if the state established his guilt, duress should have served as a complete defense. The state contends that it presented evidence that proved the essential elements of each charge and duress is not an appropriate consideration under a sufficiency of the evidence review.

{¶ 57} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 13. Crim.R. 29(A) requires the trial court to issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for the offense. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21. We apply the same standard of review to evaluate a sufficiency of the evidence claim. *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571, ¶ 12, citing *State v. Mitchell*, 8th Dist. Cuyahoga No. 95095, 2011-Ohio-1241, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386.

{¶ 58} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the state has met its burden of production at trial is conducted. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.* at 386, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 59} To survive a Crim.R. 29(A) motion or a sufficiency of the evidence challenge, the state had to present sufficient evidence on the elements of felony murder such that the trier of fact could find Garcia-Rodriguez guilty of the offense beyond a reasonable doubt. The elements of felony murder are defined in R.C. 2903.02(B): "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a

felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 60} Here, where aggravated burglary was the underlying felony giving rise to the felony murder charge, the state also had to present sufficient evidence that Garcia-Rodriguez caused Jimbo's death as a proximate result of the aggravated burglary. The elements of aggravated burglary are:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another; * * *

R.C. 2911.11(A)(1).

{¶ 61} "'[T]he felony-murder statute, does not contain a mens rea component.'" *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 77, quoting *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43. "[A] person commits felony murder * * * by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense." *Fry* at ¶ 43. The mens rea required by an aggravated burglary charge, the underlying felony offense in this matter, is "purposeful." *Fry* at ¶ 44.

{¶ 62} The evidence at trial established that Tito planned to rob Jimbo of marijuana with Garcia-Rodriguez's assistance. E.R. assisted in the robbery, and first entered Jimbo's home under the guise of wanting to purchase marijuana. After E.R.

entered Jimbo's house, Garcia-Rodriguez and Tito entered the home, armed and without permission, with the intent to rob Jimbo of marijuana. Jimbo and Savannah were present when Garcia-Rodriguez and Tito entered the home. Once inside, Garcia-Rodriguez attempted to restrain Jimbo while Tito attempted to restrain Savannah. Garcia-Rodriguez wrestled with Jimbo as he attempted to restrain him and prevent Jimbo from taking his handgun. Tito then pistol-whipped Jimbo before he shot and killed Jimbo. Jimbo died as a proximate result of the commission of the aggravated burglary.

{¶ 63} A defendant may be found guilty of felony murder absent an intent to cause the victim's death. *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 31-33. Under Ohio's felony-murder doctrine, "'a defendant may be held criminally liable for the unintended death that results from the commission of a first or second degree felony.'" *State v. Willis*, 8th Dist. Cuyahoga No. 99735, 2014-Ohio-114, ¶ 23, quoting *State v. Tuggle*, 6th Dist. Lucas No. L-09-1313, 2010-Ohio-4162, ¶ 101. Therefore, the state did not have to prove that Garcia-Rodriguez knowingly intended to cause Jimbo's death but that Jimbo's death was a proximate result of the aggravated burglary against Jimbo. Based upon the record, the state satisfied its burden. The evidence presented at trial and viewed in a light favorable to the state established each element of felony murder under R.C. 2903.02(B) and aggravated burglary under R.C. 2911.11(A)(1).

{¶ 64} Garcia-Rodriguez also argues that sufficient evidence was introduced to show Garcia-Rodriguez acted under duress. Specifically, Garcia-Rodriguez

argues he committed the criminal offenses under duress because Tito expressly threatened his life and the life of E.R. during the commission of the felony murder and aggravated burglary. A defendant may raise duress as an affirmative defense to any crime except aggravated murder. *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 54. However, a sufficiency challenge does not implicate affirmative defenses. *State v. Simes*, 8th Dist. Cuyahoga No. 103672, 2016-Ohio-7300, ¶ 20, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 37. "'Proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime.'" *Simes* at *id.*, quoting *State v. Davis*, 8th Dist. Cuyahoga No. 100526, 2014-Ohio-2769, ¶ 19, citing *Hancock* at ¶ 37.

{¶ 65} Accordingly, the trial court properly denied Garcia-Rodriguez's Crim.R. 29 motion and the convictions were supported by sufficient evidence. Garcia-Rodriguez's second assignment of error is overruled.

## III. Manifest Weight of the Evidence

{¶ 66} In his third assignment of error, Garcia-Rodriguez argues that his convictions were against the manifest weight of the evidence. Specifically, Garcia-Rodriguez argues that his actions were excused due to duress.

{¶ 67} A manifest-weight challenge tests whether the prosecution has met its burden of persuasion. *Thompkins*, 78 Ohio St. 3d at 390, 678 N.E.2d 541, (Cook, J., dissenting). A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in

resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin* at *id.*

{¶ 68} Garcia-Rodriguez argues that the trial court's convictions were against the manifest weight of the evidence because he presented sufficient evidence to support the affirmative defense of duress. The Ohio Supreme Court described duress as follows:

> One of the essential features of the defense of duress is a sense of immediate, imminent death, or serious bodily injury if the actor does not commit the act as instructed. *See State v. Cross* (1979), 58 Ohio St. 2d 482, 487, 12 Ohio Op. 3d 396, 399, 391 N.E.2d 319, 323. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw. *See State v. Good* (1960), 110 Ohio App. 415, 11 Ohio Op. 2d 459, 165 N.E.2d 28 (10th Dist.).

*State v. Getsy*, 84 Ohio St.3d 180, 199, 702 N.E.2d 866 (1998).

{¶ 69} The burden is on the accused to prove an affirmative defense by a preponderance of the evidence. R.C. 2901.05(A). Here, the trial court charged the jury regarding the defendant's defense of duress. Defendant did not object to the substance or scope of the charge of duress, thereby waiving any error. *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 97, citing *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E.2d 1364 (1977).

{¶ 70} In support of his claim of duress, Garcia-Rodriguez testified that Tito carried a gun on January 7, 2018, from the time Garcia-Rodriguez completed construction work at Tito's home, throughout the commission of the offenses at Jimbo's house, and until Garcia-Rodriguez, Tito, and E.R. returned to Tito's home. As a result, Garcia-Rodriguez never thought he could leave Tito's presence without the risk of being shot. And once E.R. appeared at Tito's home, Garcia-Rodriguez testified he could not attempt to leave because E.R. could be in danger of Tito. Garcia-Rodriguez testified that he and E.R. were in immediate danger of death or seriously bodily injury throughout the commission of the crimes and there was no reasonable opportunity for escape. Garcia-Rodriguez argues that he demonstrated by a preponderance of the evidence that he acted under duress and, therefore, his convictions were against the manifest weight of the evidence.

{¶ 71} Even assuming that Garcia-Rodriguez asserted the elements of duress, the trier of fact was not required to accept his arguments but could reject them on the grounds of credibility. *State v. Thompson*, 97 Ohio App.3d 629, 634, 647 N.E.2d 226 (12th Dist.1994). The record shows that Garcia-Rodriguez did not inform the CPD during his custodial interrogations that he participated in the aggravated robbery because of his fear of immediate threat of harm or bodily injury from Tito. Garcia-Rodriguez did not inform the questioning officers that Tito carried a gun while Garcia-Rodriguez performed construction work in Tito's house. Garcia-Rodriguez testified he did not previously provide this information during either interrogation because the exact question was never asked of him.

{¶ 72} Garcia-Rodriguez stated during those interrogations that he initially thought they were driving to Jimbo's to purchase marijuana. During the January 17 interrogation where an interpreter was present, Garcia-Rodriguez also stated he told Tito "let's take the marijuana" from Jimbo. At trial, Garcia-Rodriguez claimed he did not mean to make those comments and the officer misunderstood him because of his poor English and his "street Spanish." Garcia-Rodriguez testified that he meant to say that he did not want to rob Jimbo but he went to Jimbo's home because Tito wanted to steal the marijuana.

{¶ 73} The jury was entitled to reject Garcia-Rodriguez's version of events as they related to duress. After review, we cannot say the record demonstrates that the jury's rejection of the affirmative defense of duress and convictions were against the manifest weight of the evidence. Weighing the evidence and all reasonable inferences, considering the witnesses' credibility, and resolving the conflicts in the evidence, we do not find that the jury clearly lost its way when it convicted Garcia-Rodriguez. Accordingly, Garcia-Rodriguez's third assignment of error is overruled.

## IV. Right to Testify

{¶ 74} In his fourth assignment of error, Garcia-Rodriguez argues that the trial court infringed upon and violated his right to remain silent when the trial judge made comments to the jury about Garcia-Rodriguez potentially testifying at trial. The state contends there was no violation of Garcia-Rodriguez's rights to remain silent and not testify; Garcia-Rodriguez voluntarily chose to testify in order to obtain a jury instruction on the issue of duress.

{¶ 75} Garcia-Rodriguez claims the following comments by the trial court judge adversely effected his right to remain silent:

> Ladies and gentlemen, we'll take our morning recess. You are not to discuss this case among yourselves or allow anyone to discuss it with you or in your presence.
>
> Now you might have thought that I did not know the answer to that question about the next witness. I did know that was the last one, but I wanted to give the State of Ohio a chance to rest on the record.
>
> What happens next is outside of your hearing. We have to go through some motions and sort out all of this evidence and make sure it is appropriate your consideration and deliberation. Then I'll go through this motion hearing and we go through the process. It may take a half an hour, possibly longer. *And at that point in time, we're going to find out if the State is satisfied that you've heard enough or perhaps their client is going to take the stand as was indicated in the opening statement.* We don't know.
>
> Once again if he does, God bless him, that's his opportunity. If he doesn't, that's his right and we will respect that.
>
> So with that we are in recess for about a half an hour.

(Emphasis added). Tr. 934-935.

{¶ 76} Garcia-Rodriguez argues that the trial court violated his rights under the Fifth Amendment of the U.S. Constitution that reads, in pertinent part, "No person * * * shall be compelled in any criminal case to be a witness against himself * * * ." Garcia-Rodriguez also argues that his testimony presented during his suppression hearing could not be admitted against him at trial on the issue of guilt. Based upon the court's comments, Garcia-Rodriguez contends that he had no option but to testify on his own behalf.

{¶ 77} Initially, we note that the court's comments were made after the state presented its case-in-chief. While the trial court stated the jury would now find out if the *state* felt enough testimony was presented, we assume the court meant to say "we're going to find out if the *defense* is satisfied that you've heard enough or perhaps their client is going to take the stand as was indicated in the opening statement * * *." (Emphasis added.)

{¶ 78} We do not find the trial court's statements referenced Garcia-Rodriguez's suppression hearing testimony nor did they violate Garcia-Rodriguez's right to remain silent. On the contrary, the trial court essentially reiterated the Fifth Amendment when it stated Garcia-Rodriguez had a choice to testify on his behalf or not and the court would respect the defendant's decision. While unnecessary, the court explained that Garcia-Rodriguez had the option to testify.

{¶ 79} Thus, Garcia-Rodriguez's fourth assignment of error is overruled.

## V. Allied Offenses

{¶ 80} In his fifth assignment of error, Garcia-Rodriguez argues that the trial court erred when it failed to merge Count 1, murder, and Count 3, aggravated burglary. Specifically, Garcia-Rodriguez argues that the two crimes "occurred in one stream of action" so there were no separate victims nor any discernible conduct that separated the murder from the aggravated burglary.

{¶ 81} The Double Jeopardy Clauses of Article I, Section 10 of the Ohio Constitution and the Fifth Amendment to the United States Constitution prohibit a criminal defendant from being tried twice for the same offense and "prohibits 'the

sentencing court from prescribing greater punishment than the legislature intended.'" *State v. Pendleton*, 163 Ohio St.3d 114, 2020-Ohio-6833, 168 N.E.3d 458, ¶ 8, quoting *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). R.C. 2941.25 was enacted so that if "'"the same conduct by the defendant technically amounts to two or more related offenses, he should be guilty of only one offense."'" *Id.*, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 16, quoting Ohio Legislative Service Commission, Proposed Ohio Criminal Code 308 (Mar. 1971).

{¶ 82} R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import or where his conduct results in two or more offenses of the same kind or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 83} The Ohio Supreme Court has clarified that "[i]n determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors — the conduct, the animus, and the import." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph one of the syllabus. "Under R.C. 2941.25(B), a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the

conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus." *Id.* at paragraph three of the syllabus. Offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶ 84} A "defendant bears the burden of establishing his entitlement to the protection provided by R.C. 2941.25," and "we appl[y] a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Hazley*, 2d Dist. Montgomery No. 27107, 2016-Ohio-7689, ¶ 16, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 85} Garcia-Rodriguez was convicted of Count 1, murder, in violation of R.C. 2903.02(B) that provides in relevant part that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." Garcia-Rodriguez was also convicted of Count 3, aggravated burglary, in violation of R.C. 2911.11(A)(1) that provides the following:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 86} Here, Garcia-Rodriguez argues that the aggravated burglary and murder share the same mens rea and the aggravated burglary and murder were committed in one act. Garcia-Rodriguez relies on *State v. McKnight*, 2022-Ohio-591, 185 N.E.3d 1148 (10th Dist.), to support this position. Yet, the *McKnight* court found there is "no overarching rule to the effect that where one offense is predicated on the commission of another, with the second essentially being an element of the first, the two must automatically merge at sentencing." *Id*. at ¶ 33. "'Ultimately, if the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge.'" *McKnight* at ¶ 34, quoting *State v. Flood*, 10th Dist. Franklin No. 18Ap-206, 2019-Ohio-2524, ¶ 28.

{¶ 87} We find it was not appropriate to merge Counts 1 and 3 because the offenses are dissimilar in import and resulted in separate and identifiable harms. The record reflects that Garcia-Rodriguez committed aggravated burglary when he entered Jimbo's home, wielding a gun, with the purpose to take Jimbo's marijuana and Garcia-Rodriguez inflicted harm and threatened to inflict harm on Jimbo when he pointed a gun at Jimbo; forced Jimbo to the ground; and wrestled with Jimbo. Garcia-Rodriguez committed felony murder when Tito shot and killed Jimbo during the aggravated burglary. Because these offenses are of dissimilar import, Garcia-Rodriguez's fifth assignment of error is overruled.

## VI. Consecutive Sentences

{¶ 88} In his sixth assignment of error, Garcia-Rodriguez argues that the imposition of consecutive sentences does not comport with the requirements of R.C. 2929.14(C)(4) and, therefore, his sentences should be vacated and remanded for imposition of concurrent sentences. Specifically, Garcia-Rodriguez argues the trial court failed to make the necessary statutory findings during the sentencing hearing and in the sentencing journal entry. The state contends that the trial court complied with R.C. 2929.14(C)(4) both at the sentencing hearing and when it issued the corresponding journal entry.

{¶ 89} "In Ohio, there is a presumption that prison sentences should be served concurrently, unless the trial court makes the findings outlined in R.C. 2929.14(C)(4) to warrant consecutive service of the prison terms." *State v. Morris*, 2016-Ohio-7614, 73 N.E.3d 1010, ¶ 25 (8th Dist.), citing *State v. Primm*, 8th Dist. Cuyahoga No. 103548, 2016-Ohio-5237, ¶ 64, citing *State v. Cox*, 8th Dist. Cuyahoga No. 102629, 2016-Ohio-20, ¶ 3, and R.C. 2929.41(A). To implement consecutive sentences, the sentencing court must find that (1) a consecutive sentence is necessary to protect the public from future crime or to punish the offender, and (2) the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. R.C. 2929.14(C)(4). The court must also find that any one of the following apply:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction

imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). A sentencing court's failure to make the above statutory findings is "'contrary to law.'" *State v. Hendricks*, 8th Dist. Cuyahoga No. 101864, 2015-Ohio-2268, ¶ 12, quoting *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37.

{¶ 90} The sentencing court must make the statutory findings at the sentencing hearing and also incorporate the findings into its sentencing entry. *Hendricks* at ¶ 12, citing *Bonnell* at syllabus. Pursuant to R.C. 2929.14(C)(4), the trial court must "find" the relevant sentencing factors before it imposes consecutive sentences. *Morris* at ¶ 26. "However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." *Bonnell* at ¶ 29.

{¶ 91} A reviewing court may overturn the imposition of consecutive sentences, under R.C. 2953.08, where the appellate court "clearly and convincingly

finds that 'the record does not support the sentencing court's findings' under R.C. 2929.14(C)(4), or the sentence is 'otherwise contrary to law.'" *Hendricks* at ¶ 9, quoting R.C. 2953.08(G)(2)(a) through 2953.08(G)(2)(b). A defendant may challenge consecutive sentences on appeal in two ways: (1) the defendant argues the consecutive sentences are contrary to law because the trial court failed to make the necessary findings required by R.C. 2929.14(C)(4) or (2) the defendant argues the record does not support the court's findings made pursuant to R.C. 2929.14(C)(4). *State v. Leegrand*, 8th Dist. Cuyahoga No. 108626, 2020-Ohio-3179, ¶ 75, *rev'd in part on other grounds,* Slip Opinion No. 2022-Ohio-3623. Garcia-Rodriguez argues that the trial court did not make the statutorily-required findings.

{¶ 92} Here, the trial judge made these findings at the sentencing hearing:

> With regards to the sentencing in this case, under Count 1, the sentence by law is life with parole eligibility after 15 years.

> Count No. 3, the Court is going to impose a sentence of 11 years, plus three years for the firearm specification.

> The Court further finds that due to the defendant's history, specifically several cases out in Lorain County, plus two burglary cases both out of Lorain County, that it's necessary to protect the public from future crime and that this is not disproportionate, and the harm is so great that a single prison term doesn't adequately reflect the seriousness of the conduct. He does have an extensive criminal history. Counts 1 and 3 are to be served consecutive to each other.

Tr. 1306-1307. The trial court satisfied the statutory requirements of R.C. 2929.14(C)(4) and the corresponding journal entry contained the same language.

{¶ 93} Where the trial court's statements at the sentencing hearing complied with R.C. 2929.14(C)(4) and the court's corresponding journal entry reflected those

statements, Garcia-Rodriguez's sixth assignment of error is without merit and is overruled.

## VII. Improper Sentence

{¶ 94} In his seventh assignment of error, Garcia-Rodriguez argues that the trial court imposed an improper sentence on Count 1, felony murder. Specifically, Garcia-Rodriguez argues that the trial court's sentence did not conform with the felony-murder sentencing statute, R.C. 2929.02(B)(1), when it imposed a definite sentence. According to R.C. 2929.02(B)(1), "whoever is convicted of or pleads guilty to murder in violation of section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of fifteen years to life." The court sentenced Garcia-Rodriguez to "life with parole eligibility after 15 years." The state argues there is no discernable difference between the language presented in the sentencing statute and the imposed sentence.

{¶ 95} When a trial court acting with subject-matter and personal jurisdiction imposes a sentence contrary to law, the sentence is voidable and may be challenged on direct appeal. *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, ¶ 4, 42.

{¶ 96} The Ohio Supreme Court explained in *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, ¶ 22, that

> [j]udges have no inherent power to create sentences. Griffin & Katz, Ohio Felony Sentencing Law (2008) 4, Section 1:3, fn. 1. *See also Woods v. Telb*, 89 Ohio St.3d [504] at 507-509, 2000-Ohio-171, 733 N.E.2d 1103 [2000] (describing the legislative intent behind a new, comprehensive sentencing structure, including postrelease control).

Rather, judges are duty-bound to apply sentencing laws as they are written. *See State v. Thomas* (1996), 111 Ohio App.3d 510, 512, 676 N.E.2d 903. "[T]he only sentence which a trial court may impose is that provided for by statute. A court has no power to substitute a different sentence for that provided for by statute or one that is either greater or lesser than that provided for by law." *Colegrove* [*v. Burns*], 175 Ohio St. [437, 438, 195 N.E.2d 811 (1964)].

{¶ 97} The Ohio Supreme Court recently addressed a similar distinction between the murder sentencing statute and an imposed sentence in *State v. Leegrand*, Slip Opinion No. 2022-Ohio-3623. The *Leegrand* Court noted that the General Assembly intended R.C. 2929.02(B)(1), the murder sentencing statute, to (1) impose a minimum sentence of 15 years for murder in violation of R.C. 2903.02(B); (2) impose a maximum sentence of life in prison; and (3) prohibit a sentence for a specified duration by stating that the term shall be "indefinite." *Leegrand* at ¶ 7. On Leegrand's murder conviction in violation of R.C. 2903.02(B), the trial court sentenced him to "life in prison with eligibility of parole after 15 years." *Id*. at ¶ 2-3. Even though the trial court's sentencing entry language differed from the language of R.C. 2929.02(B)(1), a review of the sentencing entry showed

it is still readily apparent that Leegrand must serve at least 15 years in prison, that he could serve as much as life in prison, and that the murder sentence is not for a specified duration. It is clear to us that the sentencing entry is consistent with R.C. 2929.02(B)(1). The sentencing entry does neither more nor less than R.C. 2929.02(B)(1) requires.* * *

Whatever difference exists between the language of R.C. 2929.02(B)(1) and the language in Leegrand's sentencing entry, the practical difference is, at worst, de minimis, and, at best, indistinguishable.

*Id*. at ¶ 8-9.

**{¶ 98}** Here, the jury convicted Garcia-Rodriguez of felony murder pursuant to R.C. 2903.02(B) and the trial court sentenced him to life with parole eligibility after 15 years. Though the better practice would have been for the trial court to use the specific language of the sentencing statute, doing otherwise was not error where the sentencing entry conveyed the exact same meaning as the statutory language. *Id*. at ¶ 8. We follow *Leegrand* and find there is no discernible difference between the sentence imposed for Garcia-Rodriguez's felony-murder conviction and the corresponding sentencing statute.

**{¶ 99}** Accordingly, we overrule Garcia-Rodriguez's seventh assignment of error.

**{¶ 100}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
MARY J. BOYLE, J., CONCUR